# In the United States Court of Federal Claims

No. 24-462
(Filed Under Seal: July 31, 2024)
Reissued: August 13, 2024[*]

```
* * * * * * * * * * * * * * * **  *
                                  *
TESLA LABORATORIES, INC.,         *
                                  *
                 Plaintiff,       *
                                  *
        v.                        *
                                  *
THE UNITED STATES,                *
                                  *
                 Defendant.       *
                                  *
  * * * * * * * * * * * * * * * **  *
```

Eric Valle, PilieroMazza PLLC, with whom were Katherine B. Burrows, Jacqueline K. Unger, and Daniel J. Figuenick III, all of Washington, D.C., for Plaintiff.

Jeffrey Albert McSorley, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Steven J. Gillingham, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General, all of Washington, D.C., for Defendant, and Kristen M. Nowadly, Senior Assistant Regional Counsel, United States General Services Administration.

## OPINION AND ORDER

SOMERS, Judge.

In sports, commentators sometimes observe that a particular team lost a game rather than that its opponent won it. In other words, some games are won not by the strength of the team, but by the mistakes of its opponent. Much the same may occur in law, and here it has. Plaintiff Tesla Laboratories, Inc., did not write the clearest or best proposal in response to the solicitation at issue in this bid protest. The agency may have rationally decided to award the contract at issue to one of Tesla's competitors. But during both the procurement and this litigation, the government made just enough mistakes that its award was nevertheless irrational in a manner that prejudiced Tesla. For that reason, Tesla succeeds in its bid protest; moreover, the Court grants its request for injunctive relief.

---

[*] Pursuant to the protective order entered in this case, this opinion was initially filed under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.

## BACKGROUND

### A.    The Initial RFQ

The contract at issue in this protest involved testing high-grade military weapons.  The General Services Administration ("GSA" or "the agency") issued its first request for information ("RFI") related to the contract at issue in this bid protest on December 2, 2022.  ECF No. 22-1 at 2–3 ("Pl.'s MJAR").  The agency sought a contractor to "perform the required prototyping, testing[,] and diagnostics of new and novel subsystems, systems, and nascent manufacturing technologies, providing real time data and analysis to the Government, and allowing for subsequent improvements to the technologies."  Administrative Record ("AR") 3.  To do so, GSA used Federal Acquisition Regulation ("FAR") subpart 8.4, "a simplified process for obtaining commercial supplies and services at prices associated with volume buying."  48 C.F.R. § 8.402(a).  The initial RFI sought information regarding a potential offeror to "supply all of the labor, miscellaneous equipment and facilities, and engineering services needed," AR 3, while the specified tasks included "Evaluation and Testing of Ballistic Tubes," "Evaluation of Advanced Weapon System Designs," "Evaluation and Operation of Unmanned Aerial Systems (UAS)," and "Hard & Deeply Buried Targets Development, Testing, and Evaluation," AR 3–6.  The resulting request for quotation ("RFQ") followed on June 2, 2023, and four companies submitted bids: Tesla Laboratories, Inc., ("Tesla"), Universal Technical Resources, Inc., ("UTRS"), Unconventional Concepts, Inc., ("UCI"), and ███████████████████████.  ECF No. 24 at 4–5 ("Gov't MJAR").

Tesla places a great deal of emphasis on a non-public acquisition plan GSA composed on June 1, 2023, just before it issued this RFQ.  Pl.'s MJAR at 4; AR 173–186.  The acquisition plan stated that the procurement's "most important goal [was] to acquire the technical capability to provide rapid, agile prototyping in a relevant testing environment (e.g. super hard deeply buried target facility; contested, congested, or intermittent communications environment; unmanned aerial systems range; energetics safe prototype and test facility; military targets for Intelligence, Surveillance, and Reconnaissance (ISR) evaluations)."  AR 176.  For that reason, GSA stated that it would "accept higher prices for the ability to leverage near real time services provided utilizing these unique facilities in order to augment Government research efforts. . . . [and] lower the risk of scheduled completion of the negotiated prototyping, testing and diagnostics tasks under this contract."  *Id.*  The Determination and Findings Time-and-Materials Contract prepared by the Department of Defense contemporaneously reflected the acquisition plan's emphasis on capability over pure price:

> A [Firm and Fixed Price] type of contract would not be appropriate for the engineering and technical services to be awarded under this service contract, as it is not possible to estimate the amount of work required to support the various DOD customers who have shown interest in leveraging unique contractor facilities to simulate relevant environments including Super Hard and Deeply Buried Facilities . . . .

AR 191–92.  Neither document was available to the offerors.  Pl.'s MJAR at 4.

**B.      The Second RFQ**

The initial RFQ the agency issued is not the one at issue in this protest.  The agency sought clarification from all four initial bidders on July 21, 2023, asking each for information on "1) 'the maximum net explosive weight (NEW) available for the facility in which the prototype manufacturing will be completed' and (2) the vendor's 'plan for providing an operationally relevant Hard and Deeply Buried Target environment.'"  *Id.* at 6 (quoting AR 671–72, 685).  Although all four responded to the request, GSA nevertheless cancelled the first RFQ a few weeks later.  *Id.*  GSA explained that "'[d]uring the technical evaluations, the [Army] discovered that a few key elements (must-have requirements) were missing in the original PWS' and that, '[d]ue to the highly technical nature of this procurement, GSA was unaware that any key elements were missing.'"  *Id.* (quoting AR 313); *see also* Gov't MJAR at 5.  In short, the agency cancelled the first RFQ because it did not believe the RFQ was sufficiently clear regarding the procurement's requirements.

Prior to the first RFQ's cancellation, GSA gave both Tesla's and its rival UTRS's proposals a rating of "Some Confidence."  AR 691, 695.  Indeed, GSA cited the same two flaws in each proposal as lowering its expectation of success: "The contractor provided a plan to complete tasks at a variety of subcontractor facilities but lacks access to operationally relevant hard and deeply buried target representative facilities for completion of task 12" and "The contractor did not provide a description of operational net explosive weight allowances for prototyping of energetic material processes and systems, increasing technical and logistics risks for tasks 6, 7, 8, and 16."  *Id.*  In other words, GSA believed both offerors lacked the proper facilities to complete the contract.

GSA issued a second RFI on August 18, 2023.  Gov't MJAR at 6; AR 196–99.  As with the previous RFI and RFQ, the request stated that "[e]ffective transition of unique defense technologies requires test and evaluation in operationally relevant environments including underground [a] Hard and Deeply Buried Target (HDBT)."  AR 197.  The RFI defined HDBT as "a fixed, high-value facility/site that has undergone considerable reinforcement such as concrete, rock, soil, or extreme depth (10s of meters) to mitigate emissions . . . and provide resiliency against kinetic effects," and emphasized that "[e]xisting HDBT facilities will be required at the time of the award" because "the Government has neither the funding to construct new facilities for these proposed activities nor adequate time to allow for HDBT construction."  *Id.*  The RFI clearly put the bidders on notice that facilities would be a required part of the contract.

The September 21, 2023, RFQ that followed continued this emphasis but maintained the same substantive components as the prior RFQ.  The primary differences between the two centered upon "technical HDBT and explosive processing capabilities," Gov't MJAR at 8, specifically for Tasks 3, 6–8, 12, and 16, AR 808–22.  Those tasks, which are the most relevant to this protest, were "Evaluation and Testing of Ballistic Tubes" (Task 3), "Development of Advanced Diagnostics for Test & Evaluation of Energetics" (Task 6), "Prototype Additive Manufacturing/3D Printing" (Task 7), "Novel Propulsion Charge Ignition and Ballistic Testing" (Task 8), "Hard & Deeply Buried Targets Development, Testing, and Evaluation" (Task 12), and "Advanced Materials, Processing, and Characterization Methods" (Task 16).  AR 808–22.  The scope of the project was roughly the same, however: "[t]he contractor shall provide in-house

engineering services for multiple Department of Defense customers . . . . [that] will require hard and deeply buried target facilities, up to a Top-Secret facility clearance, and certification to process and test Arms, Ammunition, and Explosives." AR 808; *compare with* AR 317.

As with the prior RFQ, the stated evaluation criteria were Technical/Management and Price, with the former more important than the latter. AR 842. The RFQ's general description of these criteria was boilerplate.[1] The RFQ made clear, however, that a proposal's detail and clarity were essential to the agency's ability to confidently select the offeror for the contract:

> Approach should demonstrate an in-depth understanding of the nature of the tasks stated in the RFQ, how the offeror will fulfill the requirements, and any special capabilities that are unique to the proposed solution that will enhance the offeror's ability to meet or exceed the requirements of the RFQ. Offerors shall describe plans and approaches on how the proposed tasks will be implemented. Responses shall not be a restatement of the requirement. Responses shall be comprehensive and include detailed approaches to accomplishing the tasks and providing the deliverables.

AR 840–41. As the solicitation also stated multiple times that "Technical/Management is more important than price," the agency evidently expected that the evaluation would be based on the strengths and weaknesses of *how* the bidders proposed they would accomplish the tasks rather than merely whether they could do so. AR 842.

## C.    Tesla's Protest

████████, UTRS, and Tesla submitted quotes in response to the second RFQ. Pl.'s MJAR at 9; Gov't MJAR at 13. Elaborating upon the two stated evaluation factors, GSA rated the offerors either High Confidence, Some Confidence, or Low Confidence based on six factors that either lowered or raised the agency's confidence in an offeror's chances of successfully completing the tasks. AR 1183; Gov't MJAR at 13–14. Those six factors were "(1) facilities, (2) proposed approach and solutions to tasks, (3) relevant corporate experience, (4) risk management and quality control, (5) staffing plans for providing subject matter expertise, and (6) security requirements." AR 1180–82. For UTRS only, however, GSA added a seventh: Subcontracting Plan. AR 1180.

Whatever factors the agency used, only UTRS received an overall High Confidence rating. *Id.* Tesla and ████████ both received Low Confidence ratings. AR 1181–82. Four elements lowered GSA's confidence in Tesla's proposal, all of which involved facilities. First, regarding Task 3, Tesla made "no mention that the assigned contractor can test, collect raw data,

---

[1] The description of the Technical/Management factor stated that "[t]he offeror's technical/management approach will be evaluated on its reasonableness, innovativeness, and ability to meet the requirements of the solicitation. The offeror's approach shall demonstrate [its] ability to utilize the requested subject matter expertise to accomplish the tasks in the RFQ tasks[.]" AR 840. The description of the Price factor, meanwhile, stated that the "Offeror's pricing shall be evaluated to ensure proposed rates do not exceed the offeror's Federal Supply Service Schedule rates. Price analysis will be performed so that a fair and reasonable price determination can be made by the government." AR 842.

consult, and evaluate results of up to a 155mm weapon scale required for completion of the task." AR 1181. Second, regarding Tasks 6, 7, 8, and 16, while Tesla provided "information on facilities available to support processing of energetic materials[,] . . . the only operating facility has a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day." *Id.* Specifically, although GSA did not state that it would only consider existing facilities for these tasks, Tesla's proposed solution of "expand[ing] the AM laboratory incorporating an energetic production development facility" for Task 7 lowered the agency's confidence because it was not clear the proposed renovations would be finished in time for the contract to be completed. *Id.* Third, Task 10 required "battlefield effects simulators and signaling devices at a line of site range of 600m." *Id.* According to the GSA, Tesla's "technical description d[id] not include any information on test and evaluation capabilities" from its proposed subcontractor lead for this task. *Id.*

Most relevant to Tesla's protest, however, GSA found that the fact that "[t]hey (████) can provide the equipment to build both above and underground berms / bunkers/ structures but require the user to provide plans and inspections to ensure suitability . . . lowers expectation of success for Task 12, which requires an existing HDBT facility." *Id.* Tesla's proposal listed the subcontractor the agency referenced, ████████████████████, as having "considerable capacity" for the capabilities for Task 12 in a broad chart describing subcontractor capabilities. AR 941. In the section of the proposal discussing Task 12, however, Tesla stated that an entirely different subcontractor, ████████████████, would provide the required HDBT facilities. AR 960–61. While the subcontractor chart listed both ████ and ████ as having at least some capacity for Task 12,[2] the proposal went into much more depth for ████'s capabilities, and evidently intended it as the primary subcontractor responsible for the task. According to Tesla, however, the agency cited ████ to suggest that Tesla lacked the required HDBT facility for task. AR 1181. The agency, meanwhile, praised UTRS's proposal for its approach to Task 12. AR 1180.

The agency then completed the remaining aspects of the bid process. It evaluated price reasonableness by comparing the competitors' proposed prices to each other, to an independent government cost estimate ("IGCE"), and to competitive published price lists from three other vendors. Gov't MJAR at 16; AR 1193–95. Having found UTRS's pricing reasonable, GSA then evaluated each proposal for best value and again chose UTRS. AR 1203–14. Although its proposal cost $████ more than Tesla's, the agency's higher confidence in UTRS's ability to complete the contract and the RFQ's stated preference for Technical/Management over Price won it the contract.[3] AR 1206, 1214.

---

[2] The chart listed ████ as having only "considerable capacity" regarding the requirements for task 12, while designating both Tesla and ████ as having "full capacity." AR 941.

[3] Specifically, the Contracting Officer assigned to the procurement stated that:

> UTRS demonstrated an understanding of the requirements in terms of pilot scale explosive processing and testing, hard and deeply buried target research, and they possess the required operational explosives capacities needed to meet all the requirements specified in the RFQ. UTRS also described in detail their existing super hard and deeply buried target relevant environment further demonstrating their full understanding of all the requirements. This specificity in UTRS's quote along with other areas quoted increased the

Tesla protested UTRS's bid in this Court on March 26, 2024. ECF No. 1. After an initial status conference, entry of a protective order, and government submission of the administrative record,[4] the parties exchanged cross-motions for judgment on the administrative record on May 7 and 30, 2024. ECF Nos. 22, 24. Tesla responded to the government's cross-motion on June 10, while the government replied to Tesla's on June 17. ECF Nos. 27, 28. The Court held a lengthy hearing on the cross-motions on June 27. ECF No. 30.

## DISCUSSION

### A.    Jurisdiction and Legal Standard

The Administrative Dispute Resolution Act, amending the Tucker Act, gives the Court "jurisdiction to render judgement on an action by an interested party objecting to a solicitation by a federal agency for bids or proposal for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statue or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In exercising this bid protest jurisdiction, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5," 28 U.S.C. § 1491(b)(4), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . ," 5 U.S.C. § 706(2).

To prevail in a bid protest, a protestor must first show that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). A protestor must then show that this conduct constituted "a significant, prejudicial error in the procurement process." *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)) (internal quotes omitted). In other words, a protestor must demonstrate that it would have had "a 'substantial chance' . . . [of] receiv[ing] the contract award but for the [agency's] errors," *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citations omitted).

---

expectations of success and delivery of quality services to the Government. UTRS proposed a sound solution in their technical approach by demonstrating a clear understanding of the requirements and successfully meeting all of the Government's requirements as outlined in the RFQ. . . . [The] assessments support that exchanging $■■■■■■■■ for a High Confidence technical quote is in the best interest of the Government.

AR 1206.
    [4] The government submitted the initial administrative record on April 16, 2024. ECF No. 18. It later realized, however, that it had inadvertently included duplicate pages in the record and neglected to include some emails between the Army, GSA, and vendors related to the procurement. ECF No. 19. With the Court's permission, ECF No. 20, the government submitted a corrected administrative record on May 6, 2024, ECF No. 21. All references to the administrative record in this opinion are to the latter administrative record.

Generally, bid protests are decided on cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). In deciding a motion for judgment on the administrative record, the Court "make[s] factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. Thus, the Court assesses "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006). Put differently, "in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021) (citing cases).

**B.    Analysis**

Tesla adopted an "everything but the kitchen sink" approach to its motion, deploying a litany of arguments as to why GSA's contract award to UTRS was irrational. While Tesla contends that this is a "open-and-shut case," Pl.'s MJAR at 13, the Court does not agree. Several of Tesla's arguments rely on misleading selective quotation from UTRS's proposal and the administrative record generally; others turn on tendentious readings of its own often-vague proposal. Despite this, the government failed to respond to several of Tesla's arguments regarding GSA's price reasonableness analysis in its responsive brief. In so doing, the government waived its opposition to them, and the Court must accept the arguments as true unless manifestly unreasonable. Moreover, the administrative record is just thin enough on analysis that the Court cannot find GSA's evaluation of Tesla's proposal rational for two of the tasks for which the agency lowered Tesla's confidence ratings and with regard to the evaluation of the subcontracting plans of the offerors. For these reasons, Tesla succeeds in this protest.

**1.    Tesla has not Met its Burden to Show that GSA Contravened the RFQ by Using Unstated Evaluation Criteria**

Tesla's first argument relies on a strained interpretation of the agency's non-public acquisition plan for the procurement at issue. Tesla argues that, although "[t]here was no RFQ or other public document that indicated a vendor's facilities . . . were of paramount importance in this procurement," the acquisition plan indicates that "the Agency considered the acquisition of . . . 'unique facilities' to be among its 'most important goal' [sic] for the procurement, evaluated vendors' quotes against those [solicitation] sections before anything else, and decided to pay almost $███████ more for those facilities." Pl.'s MJAR at 13–14 (quoting AR 176) (internal citations omitted). Tesla contends that, had it known that the facilities were of such paramount importance, it would have given GSA a different proposal tailored to those goals. *Id.* at 14. Because the acquisition plan placed such importance on facilities, Tesla reasons, the agency used an unstated evaluation criterion, as the final RFQ failed to list facilities with the stated evaluation criteria of Technical/Management and Price. *Id.* Tesla argues, in other words, that "no part of the RFQ's stated evaluation criteria explains the Agency intended to consider facilities at all—much less those specific facilities implicated by the PWS sections the Agency reviewed," and that, "even if the Agency could consider facilities in its evaluation as part of its general assessment of a vendor's 'understanding of the work required,' nothing in the evaluation criteria suggested that the acquisition of those facilities . . . was among the Agency's most important

goal[s] or would be a primary consideration in its award decision." *Id.* at 15 (quoting AR 841) (internal citations omitted).

Procuring agencies must "evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation." 41 U.S.C. § 3701(a). Moreover, an agency must be transparent as to a procurement's evaluation criteria and cannot use one set of factors while stating that it used another. *See, e.g.*, *Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020) ("It is, of course, true that an agency cannot evaluate proposals on the basis of unstated criteria."); *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) ("[A]gencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). On the other hand, "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain 'great discretion' in determining the scope of a given evaluation factor." *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010) (quoting *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009)). To prove that an agency used unstated evaluation criteria, a protestor must show that (1) "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed," and (2) "the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." *NEQ*, 88 Fed. Cl. at 48 (internal citations omitted).

Tesla has not met its burden of proof. Its entire argument on this point rests on selective quotation of two phrases from two different sentences in the GSA's acquisition plan for this procurement. Tesla states that the acquisition plan indicates that "the Agency considered the acquisition of . . . 'unique facilities' to be among its 'most important goal' [sic] for the procurement . . . " Pl.'s MJAR at 13 (quoting AR 175–76). The obvious implication of Tesla's cobbled-together quotation is that GSA considered facilities to be the "most important goal" of this procurement, even more than the weapons testing itself. However, the full sentences in the acquisition plan from which Tesla selectively quotes have the opposite meaning. The acquisition plan states that

> [t]he government's most important goal is to acquire the technical capability to provide rapid, agile prototyping in a relevant testing environment (e.g. super hard deeply buried target facility; contested, congested, or intermittent communications environment; unmanned aerial systems range; energetics safe prototype and test facility; military targets for Intelligence, Surveillance, and Reconnaissance (ISR) evaluations). As a result, the Government will accept higher prices for the ability to leverage near real time services provided utilizing these unique facilities in order to augment Government research efforts.

AR 176. These sentences say only that the purpose of the procurement was to find a contractor that could provide *both* the required weapons testing capabilities and the facilities in which those weapons could be tested. It does not state that acquiring facilities was the procurement's most important goal; instead, it simply explains that the facilities would be integral to successfully testing the weapons specified in the solicitation. Stated differently, GSA explained that its most important goal was to acquire the technical capability to provide prototyping *in* a relevant testing

environment, not that its most important goal is to acquire a relevant testing environment or that the testing environment is somehow a goal divorced from the testing itself.

The final RFQ is consistent with the purpose GSA specified in the acquisition plan. The RFQ's first page states that "[t]he contractor shall provide in-house engineering services for multiple Department of Defense customers," and shall "supply all the labor, miscellaneous equipment and facilities, and engineering services needed to complete the tasks/deliverables under this requirement."[5] AR 808. Put differently, the agency sought both a company that could test the weapons described in the solicitation and the facilities in which to do so. This contrasts with, for example, procurements that call only for labor services. An agency could, for instance, seek to procure a contract for the services of air traffic controllers to operate pre-existing federally-owned air traffic control facilities. *See generally Trace Sys. Inc. v. United States*, 165 Fed. Cl. 44 (2023). If an agency, however, specified that it needed a contractor that could both provide air traffic controllers and build a tower from which they could operate, any potential offerors would not be blind-sided if they discovered an acquisition plan that stated the agency's most important goal in issuing the solicitation was to find a contractor that provided both the labor and the facilities. So too, Tesla should not have been surprised that GSA evaluated its proposal based upon the facilities for which the RFQ clearly called.

Tesla protests nevertheless that "no part of the RFQ's stated evaluation criteria explains the Agency intended to consider facilities at all—much less those specific facilities implicated by the [performance work statement] sections the Agency reviewed." Pl.'s MJAR at 15. Its reading of the RFQ's evaluation criteria is too cramped. The RFQ gives two factors upon which the agency would evaluate proposals: Technical/Management and Price. *See* AR 840–42. It elaborated that, for the Technical/Management element, the agency would determine whether the offerors "demonstrate[d] their ability to utilize the requested subject matter expertise to accomplish the tasks in the RFQ" and "demonstrate[d] a clear understanding of the technical and managerial environment and requirements related to the tasks required in this solicitation." AR 840. The specific tasks described in the RFQ, in turn, provided multiple times that offerors needed to have facilities. Task 12, for example, required contractors to "provide means to simulate new sources for underground testing, in particular Hard and Deeply Buried Target (HDBT) testing as well as a representative operational environment in which to validate technologies." AR 816. Furthermore, the RFQ went into detail about the acceptable HDBT testing environment. AR 816–17. The ability to accomplish Task 12 requires providing a sufficient HDBT testing facility, and Tesla's capacity to provide one falls under the RFQ's stated

---

[5] The RFQ also states, under the heading "Facility Capabilities Required," that

The contractor must have the means to maintain the necessary facilities and certifications to handle, process, and produce energetic materials up to and including HAZMAT 1.1D substances and articles to accomplish all energetic material tasks identified in this PWS, including an Alcohol, Tobacco, and Firearms (ATF) certificate. The contractor must coordinate a site visit with Defense Security Services (DSS) and Defense Contract Management Agency (DCMA) and must gain the appropriate approval within 60 days of award.

AR 829.

Technical/Management criterion because it turns on the successful contractor's capability to complete the task as described.[6]

Tesla retorts that, even if the Technical/Management criterion provided some notice that GSA would evaluate proposals based on the facilities required, "nothing in the evaluation criteria suggested that the acquisition of those facilities . . . was among the Agency's most important goal [sic] or would be a primary consideration in its award decision." Pl.'s MJAR at 15. Tesla argues that the RFQ described facilities as "'miscellaneous' to the overall work and treated them as such." *Id.* (quoting AR 808). In support, Tesla references a sentence in the RFQ that states "[t]he Contractor shall supply all the labor, *miscellaneous* equipment and facilities, and engineering services needed to complete the tasks/deliverables under this requirement." AR 808 (emphasis added). Tesla's argument fails definitionally. Inconceivably, Tesla emphasizes the word "miscellaneous" throughout this argument; however, that word does not mean what Tesla thinks it means. *See* THE PRINCESS BRIDE (ACT III COMMUNICATIONS 1987) ("Inconceivable. . . . You keep using that word. I do not think it means what you think it means."). Tesla suggests that the word "miscellaneous" means that the facilities are minor or auxiliary to the primary purpose of procurement. However, miscellaneous instead means "of various types or from different sources" or "composed of members or elements from different kinds." *Miscellaneous*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010). As different tasks require the successful contractor to have different facilities to test different weapons, this correct definition fits comfortably into the RFQ's stated purposes.

Because the RFQ specifically required offerors to "supply all the . . . facilities . . . needed to complete the tasks/deliverables under this requirement," the facilities were not as marginal to the procurement as Tesla suggests. AR 808. Tesla argues for their periphery by pointing out that RFQ "sections 6.3; 7.13; 8.5; 16.4.3.1; 12.4; 12.5; and 12.5.3.5," the sections that mention facilities most prominently, "constitute just 7 of the 173 sections in the PWS, or 4% of the requirements." Pl.'s MJAR at 15. Quantifying the sections in this way is gravely misleading. Suppose the government sought to procure the services and facilities necessary to stage a basketball game. Suppose also that the procurement's RFQ had 100 sections, each of which detailed the various aspects of a basketball game, including the concessions, the referees, the players, and the equipment. One section, however, said that "the offeror must propose a basketball court of regulation length and width." Though it makes up only one percent of the sections in this hypothetical RFQ, the basketball court requirement is one of the most important, and an offeror would need no special notice to understand that acquiring the basketball court was a necessity. Just the same, the procurement at issue in this protest required both weapons testing services and the facilities at which they could be tested. AR 808. Any reasonable offeror would have understood that the facilities it proposed would be one of the primary aspects of the proposal GSA would evaluate.

Tesla should also have understood that GSA intended to evaluate the proposals submitted for the RFQ based on proposed facilities because of the circumstances that preceded it. The RFI

---

[6] Even if the RFQ did not explicitly require a sufficient HDBT testing facility, "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain 'great discretion' in determining the scope of a given evaluation factor." *PlanetSpace, Inc.*, 92 Fed. Cl. at 536 (quoting *NEQ, LLC*, 88 Fed. Cl. at 48)

for this RFQ stated explicitly that "[e]xisting HDBT capabilities will be required at the time of the award" because "the Government has neither the funding to construct new facilities for these proposed activities nor adequate time to allow for HDBT construction." AR 197. In the agency's evaluation of the quotes submitted in response to the first RFQ, which was substantially similar to the one at issue in this protest, both of the aspects of Tesla's proposal that the agency found lowered its confidence in success had to do with facilities. AR 691. Even before that, however, GSA sought clarification from each offeror prior to evaluating them under the first RFQ regarding: 1) "the maximum net explosive weight (NEW) available for the facility in which the prototype manufacturing will be completed"; and (2) the offeror's "plan for providing an operationally relevant Hard and Deeply Buried Target environment." AR 671–72, 685. Tesla obviously understood the importance of facilities before it submitted its proposal in response to the second RFQ, for it "added '█████████████ to the team,'" specifically because it had "'dozens of potential HDBTs around the United States and around the world that could be used as test sites for this [solicitation].'" Pl.'s MJAR at 7 (quoting AR 221). If Tesla had no knowledge that GSA would evaluate its proposal based in part on the facilities it proposed, it would have had no reason to add a subcontractor that specialized in acquiring HDBT facilities. Tesla clearly understood that facilities were an integral part of the procurement and responded accordingly.

Tesla has failed to show that the agency used a significantly different basis in evaluating the proposals than was disclosed in the RFQ. Its entire argument rests on a misleading partial quote from the acquisition plan. Read in its full context, the sentence it cites is perfectly consistent with the final RFQ's twin goals of acquiring both the facilities in which to test weapons and the engineering services with which to test them. The RFQ states that successful proposals must include information on facilities and that GSA will evaluate the offerors' proposals on their ability to accomplish the tasks as described in the RFQ. As those tasks described the necessity of acquiring facilities, its evaluation should have come as no surprise to Tesla. Tesla's decision to add █████████████ as a subcontractor in its second proposal also suggests that it understood the importance of facilities in the agency's evaluation of the RFQ. As Tesla has not met its burden of proof, its protest cannot succeed on this basis.

## 2. Parts of GSA's Evaluation of Tesla's Proposal were Irrational

GSA determined that the facilities Tesla proposed for tasks 3, 6–8, 10, 12, and 16 lowered its confidence that Tesla could complete the contract as described. Tesla argues that GSA's evaluation was irrational for Tasks 6–8, 10, 12, and 16, but does not challenge its evaluation for Task 3. *See* Pl.'s MJAR at 18–26; Gov't MJAR at 21 ("Tesla has conceded this technical shortcoming [for Task 3] because it does not challenge this finding in its motion."). It therefore accepts that the agency rationally determined that at least part of its proposal lowered its chances of successfully completing the project, but vigorously disputes the reasoning the agency used to fault the other parts of its proposal. Specifically, Tesla challenges the agency's characterization of its proposed facilities' capability to process 1.1 explosives for Tasks 6–8 and 16, its finding that Tesla lacked an existing HDBT testing facility with its subcontractors █████ ████████████ and ████████████████ for Task 12, and its determination that Tesla lacked the required shooting range with a line of sight of at least 600 meters for Task 10. Pl.'s MJAR at 18–26. As explained below, Tesla succeeds in the latter two challenges.

**a.  Tasks 6–8 and 16 and Tesla's proposed 1.1 explosives facilities**

Pursuant to the RFQ, Tasks 6, 7, 8, and 16 require facilities capable of processing up to 500 pounds of 1.1 explosives.  For example, Task 6 requires that "[t]he contractor must have the means to maintain a facility with a pilot scale net explosive weight with up to 500 pounds . . . to process prototype energetic material systems to evaluate the efficacy of testing and diagnostics technologies."[7]  AR 811.  Although the tasks themselves do not specify what types of explosives the facilities must handle, the RFQ's blanket "Facility Capabilities Required" description provides that

> [t]he contractor must have the means to maintain the necessary facilities and certifications to handle, process, and produce energetic materials up to and including HAZMAT 1.1D substances and articles to accomplish all energetic material tasks identified in this PWS, including an Alcohol, Tobacco, and Firearms (ATF) certificate.

AR 829.  This provision applies to tasks 6, 7, 8, and 16, the descriptions of which all mention "energetic material."  AR 811–13, 822.  According to GSA, Tesla's proposal lowered the agency's confidence in its ability to complete the contract with regards to Tasks 6–8 and 16 because "[w]hile [Tesla] proposed multiple sites where there is *storage* capacity for 1.1 explosives, the only operating facility ha[d] a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day[.]"  AR 1181 (emphasis added).  In other words, it lacked the capacity to process the 500 pounds of 1.1 explosives the RFQ required.  Moreover, for Task 7 in particular, the agency found that Tesla's "statement '[███████████████████████ ███████] will expand the AM laboratory incorporating an energetic production-development facility' lowers expectation of success due to the uncertainty of completion in time for contract award."  *Id.* (internal citations omitted).

*i.  Unstated evaluation criteria*

Tesla challenges these findings upon multiple grounds.  It argues first that GSA used unstated evaluation criteria by sanctioning Tesla for not having facilities rather than having the means to maintain them at the time of the award.  Pl.'s MJAR at 18–19.  Tesla contends that "[h]aving 'the means to maintain a facility' is markedly different from a requirement to have a facility at the time of quote submission or award," especially because the RFQ's general facilities requirement stated only that "'[t]he contractor must coordinate a site visit with Defense Security Services (DSS) and Defense Contract Management Agency (DCMA) and must **gain the**

---

[7] Tasks 7, 8, and 16 have similar requirements.  Task 7 requires "the means to maintain a facility with a pilot scale net explosive weight with up to 500 pounds . . . to process prototype printed energetic material components and to prove out the safety and operational viability of the multi-mode prototype printers for future scale up and transition to the organic industrial base."  AR 812.  Task 8 requires "the means to maintain a facility with a pilot scale net explosive weight with up to 500 pounds in order to process prototype propulsion charges with integrated novel ignition systems to evaluate the efficacy of the technologies for further maturation and transition to advanced weapon systems."  AR 813.  Task 16 requires "the means to maintain a manufacturing facility with a pilot scale net explosive weight with up to 500 pounds in order to process prototype energetic material systems and components."  AR 822.

**appropriate approval[s] within 60 days of award.**'" *Id.* at 19 (quoting AR 829) (emphasis in original). It also argues, albeit halfheartedly, that "the RFQ requirements under Tasks 6, 7, 8, and 16 do not relate to 1.1 explosives specifically. As such, the Agency's focus there constitutes application of another unstated evaluation criterion." *Id.* at 19 n.9. As with its more general unstated evaluation criteria argument for facilities, Tesla believes itself prejudiced by the alleged failure of GSA to disclose each requirement.

Tesla's characterization of GSA's evaluation does not comport with the facts documented in the administrative record. Although the RFQ does state that the only requirement is that "[t]he contractor must have the means to maintain the necessary facilities and certifications," AR 829, it also states more generally that each proposal would be "evaluated on its reasonableness, innovativeness, and ability to meet the requirements of the solicitation," AR 840. The agency evaluated Tesla's proposal to obtain the required facilities and did not exclude Tesla from competition because it believed that it did not have them. Instead, the agency reasoned that "the only operating facility [Tesla proposed] ha[d] a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day." AR 1181. Tesla's competitor UTRS, meanwhile, had a subcontractor that ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████ AR 1180 (internal citations omitted). The agency evaluated both proposals for whether the offeror "ha[d] the means to maintain the necessary facilities" and concluded rationally that, because UTRS had an existing facility that met the contract's specifications while Tesla still had to acquire one, its confidence in UTRS's ability to complete the contract on time was greater than its confidence in Tesla. AR 1206. Therefore, the agency gave UTRS a higher confidence rating than Tesla not because of an unstated requirement for having existing facilities at the time of proposal, but rather because an offeror possessing an existing facility with no need to acquire a new one is inherently superior (in terms of confidence to complete a task) to one that proposes to acquire a facility later.

Tesla's lack of a 1.1 explosives facility at the time it submitted its proposal also comports with the agency's justifiable concern from a confidence perspective that Tesla may not have been able to acquire the facilities within the required 60-day window. The agency criticized Tesla's proposal with respect to Task 7 for this very reason. AR 1181 (stating that "[a]lthough task 7 in the RFQ does not specify that an existing facility is necessary, one can still claim that the statement '████ will expand the AM laboratory incorporating an energetic production-development facility' lowers expectation of success due to the uncertainty of completion in time for contract award") (quoting AR 955) (internal citations omitted). While it is possible that Tesla could upgrade its facilities to the extent it proposed within the 60 days allotted by the RFQ, GSA could conclude rationally that the possibility of Tesla's failure to complete the required facilities on time lessened its confidence in Tesla's ability to complete this part of the procurement. The agency could additionally have had lessened confidence because it had no way of evaluating some future facility, especially one that is not described with any particularity in Tesla's proposal.

Tesla's other unstated criterion argument is equally unpersuasive. It argues that "the RFQ requirements under Tasks 6, 7, 8, and 16 do not relate to 1.1 explosives specifically. As such, the Agency's focus there constitutes application of another unstated evaluation criterion."

Pl.'s MJAR at 19 n.9.  Tesla evidently does not put much stock into this argument; these two sentences are all the elaboration that it gives in its motion for judgment on the administrative record, and they appear only in a footnote.  Nor should it have.  The RFQ states specifically that offerors "must have the means to maintain the necessary facilities and certifications to handle, process, and produce energetic materials up to and including HAZMAT 1.1D substances and articles to accomplish all energetic material tasks identified" in the RFQ.  AR 829.  This blanket statement made it unnecessary for the agency to specify that facilities had to have a 1.1 explosives capacity in the description of each individual task.  Tesla would have GSA write derivative explosives descriptions in the specifications for every relevant task despite the blanket statement.  Finding an unstated criterion simply because GSA chose not to write repetitively is unwarranted.

### ii.  Latent ambiguity

Failing to provide proper proof of any unstated criteria, Tesla argues next that the RFQ is latently ambiguous in its description of when successful bidders need to have the required facilities.  It contends that

> [t]he RFQ required the successful vendor to coordinate a site visit and gain approval of its facility within 60 days of contract award and then possess the 'means to maintain [the] facility' thereafter.  Accordingly, it was reasonable to interpret the RFQ as not requiring them to demonstrate that they had, at the time of quote submission or award, an existing facility lest they be downgraded and effectively eliminated from the competition.

Pl.'s MJAR at 20–21 (quoting AR 810–13, 821–23, 829) (internal citations omitted).  Accordingly, Tesla asserts that GSA "ignored the 'Facilities Capabilities Required' section of the RFQ and interpreted the PWS provisions, requiring vendors to have the 'means to maintain a facility,' as requiring vendors to have the relevant facilities at the time of quote submission or award."  *Id.* at 21 (quoting AR 1199).  Tesla finds this interpretation of the RFQ unreasonable, but, if the Court should find the agency's interpretation reasonable, argues that its interpretation—requiring only the ability to procure a facility capable of processing 500 pounds of 1.1 explosives—was equally reasonable.  *Id.*  It therefore requests the Court to "order the Agency to clarify its requirements in an amended RFQ, solicit revised quotes, and make a new award."  *Id.*

This argument is barely distinguishable from Tesla's previous one, and the evaluation within the administrative record contradicts its characterization of the apparent ambiguity.  A latent ambiguity is "a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'"  *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 406 (2022) (internal quotations omitted).  As explained above, however, the administrative record evinces that both Tesla and GSA gave the facilities requirement the same meaning.  Contrary to Tesla's assertion, GSA did not "requir[e] vendors to have the relevant facilities at the time of quote submission or award."  Pl.'s MJAR at 21.  The agency gave Tesla a lowers expectation of success rating because the agency found that

Tesla likely could not acquire the 1.1 explosives facilities by the sixty-day deadline.  AR 1181 (finding that Tesla's proposal "lowers expectation of success due to the uncertainty of completion in time for contract award.").  If the agency interpreted the facilities requirement as Tesla argues that it does, the agency simply would have disqualified Tesla from competition for failing to have the 1.1 explosives facilities for Tasks 6, 7, 8, and 16 when it submitted its proposal.  The Court does not, therefore, find any ambiguity in the RFQ's facilities requirements.

Moreover, as will be discussed directly below, Tesla did not propose a 1.1 explosives facility at the time of contract award or any time thereafter.  Therefore, even if a latent ambiguity exists as to when such a facility was required, Tesla was not prejudiced by this alleged ambiguity, because it never proposed having the required 1.1 explosives facility.

### iii.  Misreading

Finally, and most substantially, Tesla contends that GSA misread its proposal and found risk where there was none.  Returning to the agency's assessment that Tesla's "only operating facility has a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day," Tesla argues that the agency attributed this facility capacity to the wrong subcontractor.  Pl.'s MJAR at 22 (quoting AR 1199) (internal citations omitted).  The agency ascribed this capacity to one of Tesla's subcontractors, ███, AR 1181, 1199; according to Tesla, "the referenced capacities are for a separate subcontractor's facilities (not ███'s), and [Tesla] did not propose that subcontractor to perform this work."  Pl.'s MJAR at 22 (emphasis omitted).  Instead, according to a chart illustrating the proposed distribution of work for the procurement, Tesla "proposed to perform the work itself along with its subcontractors, ███ and [███████]."  Id. (citing AR 941).  According to Tesla, the subcontractor whose facilities had a limit of five pounds was ████████████████ ("███"), not ███.  See AR 940 (stating that ███'s "facility can handle unlimited detonations with explosive charges up to 5lbs, and 1 detonation per day with explosive charges from 5 to 20 lbs").  As Tesla did not propose to use ███'s facilities for tasks 6, 7, 8, and 16, which all require obtaining facilities capable of processing 500 pounds of 1.1 explosives, it argues that GSA carelessly misread the proposal and prejudiced it.

Tesla's argument is correct to some degree.  The agency analyzed one of Tesla's subcontractor's explosives facilities' capabilities even though Tesla did not propose to use it for Tasks 6, 7, 8, and 16.  The government does not contradict Tesla's claim in its cross-motion.  See Gov't MJAR at 28–29.  To be fair to the government, however, Tesla's proposal does not describe its proposed facilities in much detail, and does not describe in detail any facility that has, as the RFQ requires, "the means to maintain a facility with a pilot scale net [1.1] explosive weight with up to 500 pounds in order to process prototype energetic material systems . . ."  AR 811 (emphasis omitted).  Tesla's proposal explicitly states that ███, which Tesla stated it would use for Tasks 6, 7, and 16, see AR 941, has "a License for one (1) High Explosives storage magazine with a capacity of 50 pounds; with . . . limits of > 5 pounds of 1.1" explosives, a tenth of the capacity required by the solicitation, AR 939.  The agency may have decided to consider all possible explosives testing facilities described in Tesla's proposal, and credited ███'s statement that it could "store up to 10,000 lbs of explosives in a ATF Type II weapons storage facility . . . . [that] can handle unlimited detonations with explosive charges up to 5lbs, and 1

15

detonation per day with explosive charges from 5 to 20 lbs" even though Tesla did not propose using it for the tasks for which the agency gave Tesla a "lowers expectations of success" rating. AR 940.  In so doing, however, the Agency ascribed such capabilities to ███ when it should have done so for ███.  *Compare* AR 940 (stating that ███'s facility "can handle unlimited detonations with explosive charges up to 5lbs, and 1 detonation per day with explosive charges from 5 to 20 lbs.") *with* AR 1181 (lessening confidence because "the only operating facility has a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day," and crediting this facility to "███, Pages 2–3").  Doing so was undoubtedly an error.

For purposes of a bid protest, however, an agency's error matters only to the extent it prejudices the protestor.  As the government points out, "the identity of the specific subcontractors Tesla assigned to Tasks 6–8 [and] 16 . . . [is] immaterial because Tesla's proposal fails to provide details relating to the capabilities of any of its subcontractors that cure GSA's stated concerns."  ECF No. 28 at 7.  Tesla proposed that it, ███, and ███ would accomplish Tasks 6, 7, 8, and 16.[8]  AR 941.  As Tesla only had "some capacity" for Tasks 6 and 16 and no capacity for Tasks 7 and 8, ███ and ███ were primarily responsible for completing all four.  *Id.*  Only for Task 7 did Tesla's proposal go into any detail about the facilities it proposed to use, and GSA's evaluation addressed those more specific plans as described above.  *Compare* AR 955 (stating that "███ will expand the AM laboratory incorporating an energetic production-development facility") *with* AR 1181 (lessening confidence because "[a]lthough task 7 in the RFQ does not specify that an existing facility is necessary . . . the statement '███ will expand the AM laboratory incorporating an energetic production-development facility' [increases] uncertainty of completion in time for contract award") (quoting AR 955) (internal citations omitted).  As stated already, ███'s subcontractor description specifically stated that its only facility for 1.1 explosives had a *storage* capacity of 50 pounds, AR 939, well under the required 500 pound *processing* requirement, *see e.g.*, AR 812.  The agency could take little comfort in Tesla's chart's claims that ███ and ███ had "full capability" to complete their respective tasks when the rest of Tesla's proposal told it little about the facilities it proposed to use to complete those tasks and then, even to the extent it described those facilities, Tesla's proposal described a facility that did not meet GSA's requirements.

Tesla nevertheless insists that it had more than enough 1.1 explosives capacity, an argument that it develops from the agency's apparent misread of its proposal for Task 7.  It stated that



███ did not need to expand its facilities . . . to meet the explosives capacity requirement.  Rather, the Agency only believed ███ needed to "expand" its facilities to meet the explosives capacity requirements because it erroneously believed ███'s "operating facility has a limit of 5 lbs and the testing facility can only detonate up to 20 lbs once per day. . . ."  ███ plans to expand the AM laboratory in relation to completing certain portions of Task 7, not to meet the requirement to "have the means to maintain a facility with a pilot scale net explosive weight with up to 500 pounds."

---

[8] Tesla proposed that ███ would perform Tasks 6, 7, and 16, while ███ would perform Tasks 6, 8, and 16.  AR 941.

Pl.'s MJAR at 23 (quoting AR 1199, 812) (internal citations omitted).  Tesla contends that GSA should have "should have considered the portion of [Tesla]'s quote explaining ███ can store up to '800' pounds of explosives."  *Id.*

The section of its proposal to which Tesla points would give GSA no confidence in its ability to complete Tasks 6, 7, 8, and 16 because that section describes ███'s ability to store up to 800 pounds of "1.3 and 1.4 explosives."  AR 939.  As defined by the Department of Transportation, 1.1, 1.3, and 1.4 explosives are quite different from each other.  While 1.1 explosives are a "mass explosion hazard," 1.3 and 1.4 explosives are "a fire hazard and either a minor blast hazard or a minor projection hazard or both, but not a mass explosion hazard" and "no significant hazard," respectively.  U.S. DEPARTMENT OF TRANSPORTATION, 2024 EMERGENCY RESPONSE GUIDEBOOK 6 (2024).[9]  Such a difference in power indicates that a facility may be capable of storing one type of explosives but not another.  The agency could not easily have evaluated the specific merits of this facility no matter what kinds of explosives it could store because Tesla's proposal mentions it in only one sentence without further elaboration.  Moreover, even had it done so, the facility, at least as described in the proposal, was still insufficient to complete the relevant tasks satisfactorily because, as Tesla represented in its cross-motion, ███'s facility can only "*store* up to '800' pounds of explosives."  Pl.'s MJAR at 23 (quoting AR 939) (emphasis added).  The RFQ, however, required facilities that could "handle, process, and produce" 500 pounds of 1.1 explosives, not simply store them.  AR 829.

Although GSA may have ascribed ███'s facilities to ███ and assigned weakness to Tesla based on that error, the error did not prejudice Tesla because the rest of Tesla's proposal does not suggest that it had the facilities required to process at least 500 pounds of 1.1 explosives.  If it did, it did not describe those facilities with detail sufficient that the agency could be reasonably confident in Tesla's ability to complete Tasks 6, 7, 8, and 16.  *See Off. Design Grp. v. United States*, 951 F.3d 1366, 1373–74 (Fed. Cir. 2020) ("To establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award.") (internal citations omitted).  As with both of Tesla's other arguments regarding those tasks, the record supports GSA's assignment of a lowers expectations of success rating.

### b.  Task 12 and HDBT facilities

Tesla argues next that GSA erred in ascribing responsibility for providing the HDBT facilities required for Task 12 to ███ rather than to ████████████████.  The agency found that "[t]he statement, 'They (███) can provide the equipment to build both above and underground berms / bunkers/ structures but require the user to provide plans and inspections to ensure suitability' lowers expectation of success for Task 12, which requires an existing HDBT facility."  AR 1181 (quoting AR 940) (internal citations omitted).  As Tesla points out, however, it did not intend to use ███ as its primary contractor for completing Task 12.  Pl.'s MJAR at 24.  Tesla's chart associated ███ with Task 12, for which it designated ███ as having "considerable capability," but also ascribed "full capability" to itself and ███.  AR 941.  The section of Tesla's proposal that details its plan for Task 12 does not even mention ███.  AR

---

[9] *Available at* https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2024-04/ERG2024-Eng-Web-a.pdf.

960–61.  This section describes instead █████'s "range of underground and above-ground survival shelters designed to provide protection from natural disasters, including tornadoes, hurricanes, earthquakes, and NBC threats" that "make them suitable for individuals and families seeking peace of mind and preparedness for a variety of emergencies."  AR 960.  The proposal also states that █████ "will work with Tesla to provide locations of HDBTs that serve as test sites," including providing Tesla with "██████████████████████████████████████████████████████████." AR 960.  These claims compound █████'s earlier description of itself as a company that "produces" survival shelters.  AR 940.  █████'s description, meanwhile, did not indicate specifically that it had HDBT capabilities despite Tesla's chart.  *See id.*  As the assigned weakness focused exclusively on █████, Tesla believes that GSA lowered its confidence irrationally.

Tesla's proposal regarding its HDBT facilities was unclear and suffered in comparison with the description in UTRS's proposal.  Tesla argues that its proposal "plainly demonstrates that it has existing HDBT facilities through its subcontractor, █████."  Pl.'s MJAR at 24.  Yet █████'s subcontractor description mentions first the company's ability to "produce[] a wide range of survival shelters" rather than any existing facilities, AR 940.  Tesla's Task 12 description states that Atlas can provide "a set of existing representative HDBTs" by "provid[ing] locations of HDBTs that serve as test sites," including ██████████████████████████████" AR 960.  These proposed sites are non-specific, and give scant detail on their individual capabilities.  UTRS, meanwhile, proposed a specific facility in ████████████████ for the Task 12 testing.  AR 1027.  UTRS offered "[b]eyond physical access, a nearly complete set of diagrams, prints, and drawings [that can be] obtained and converted to electronic recall . . ."  *Id.*  In short, UTRS's proposal is much more specific and detailed with regard to Task 12 than Tesla's proposal.

True though this might be, GSA gave Tesla a lowers expectations of success rating related to █████'s capabilities regarding HDBT facilities; this was irrational.  The agency's description of why █████'s capabilities lowered its expectations is very thin: "[t]hey (█████) can provide the equipment to build both above and underground berms / bunkers/ structures but require the user to provide plans and inspections to ensure suitability' lowers expectation of success for Task 12, which requires an existing HDBT facility."  AR 1181 (quoting AR 940) (internal citations omitted).  It is not entirely clear what exactly GSA meant by this statement.  If █████ lowered GSA's confidence because it believed that Tesla proposed to use █████ to satisfy the existing HDBT facility requirement for Task 12, GSA acted unreasonably.  In discussing its approach to Task 12, Tesla focused exclusively on █████'s ability to provide an HDBT facility, and stated, if somewhat vaguely, that it had access to such facilities.  AR 960 (stating that █████ could provide ██████████████████████████████████████  Tesla did not propose ██████████ would provide the HDBT facilities required for Task 12, and, if the agency believed otherwise, it lowered Tesla's confidence irrationally when it did so.

The agency may also have meant that the fact that Tesla discussed █████'s bunker-building capabilities suggested that Tesla did not understand that Task 12 required an existing HDBT facility.  But the administrative record does not support this inference.  Disregarding the

above-discussed fact that Tesla's proposal did not even mention ███ in its detailed discussion of Task 12, ███'s subcontractor description gives little to associate it with HDBT facilities.  The only line relevant to Task 12 and HDBT facilities is the one the agency cited: "[███] can provide the equipment to build both above and underground berms / bunkers/ structures but require the user to provide plans and inspections to ensure suitability." AR 940.  This description is consistent with, if not particularly descriptive of, Tesla's assertion that ███ has "considerable capability" to complete the tasks required for Task 12. AR 941.  However, that line alone is insufficient for GSA to conclude, if indeed it did so, that Tesla did not understand that Task 12 required existing HDBT facilities, especially because Tesla stated explicitly that ███ had them available.  AR 960 ("[N]one of this analysis is possible without a set of existing representative HDBTs to study and passively test novel detection technologies. . . . [███ will] provide locations of HDBTs that serve as test sites . . . .").  Tesla obviously knew that it needed to have an existing HDBT facility to complete Task 12, and GSA could not reasonably have concluded otherwise from the proposal's description of ███.

The government defends GSA's lowers expectations of success rating regarding Task 12 of Tesla's proposal in only one sentence of its cross-motion: "Tesla failed to include details in its proposal about ███'s capabilities to provide an operationally relevant HDBT environment and, therefore, GSA found that Tesla's proposal did not provide enough information to give it confidence that Tesla had the necessary capability." Gov't MJAR at 28.  This argument both fails to respond to Tesla's argument and finds no support in the record.  The agency's evaluation did not mention ███ when it explained why Tesla's proposal lowered its confidence except perhaps in its blanket statement that "[a]ll other areas of the contractor's proposal in accordance with Section 37.1 of the solicitation were considered adequate." AR 1181.  As it did not discuss ███ elsewhere in its evaluation, this statement suggests that GSA may have been satisfied with the detail Tesla provided about ███'s HDBT facility capabilities.  Tesla's argument, however, is not that the agency unreasonably lowered its expectations based on anything to do with ███ itself, but rather that the agency unreasonably sanctioned ███ for its lack of existing HDBT facilities even though Tesla did not propose to use ███ for that purpose.  Pl's MJAR at 23–25.  The government cannot substitute another reason for its lowered expectations in place of the one GSA gave at the time of the evaluation.[10]  *See Dist. Commc'ns Grp., LLC v. United States*, 169 Fed. Cl. 538, 545 (2024) ("[T]he Court must emphasize that it examines only the contracting officer's findings and any documents in the administrative record upon which the contracting officer relied in making those findings to determine whether the contracting officer's . . . conclusion regarding Plaintiffs was rational."); *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) ("[The Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; post hoc explanations for agency decisions ordinarily will be rejected."); *accord Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the

---

[10] The government makes the same mistake in its reply.  It states there that "Tesla's proposal does not identify any details that would enable GSA to compare any of its subcontractors' HDBT capabilities (███, etc.) to the detailed definition GSA included in the RFQ about what constitutes a 'representative HDBT operational environment.'" ECF No. 28 at 9 (quoting AR 816–17, 940, 960–61, 1181) (emphasis omitted).  This is not the explanation that GSA provided in the record, and the Court cannot evaluate its reasonableness because it is a post-hoc rationalization.

agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.  Accepting contrived reasons would defeat the purpose of the enterprise.").

The Court's considerable guesswork trying to interpret GSA's stated explanation for its lowered confidence with respect to Tesla's proposal for Task 12 reflects the sparse reasoning in the administrative record to support the agency's conclusion.  Had GSA provided more explanation for its lowers expectation of success ratings, especially for Task 12, there may have been some language to support the government's post-hoc rationalization in its filings before this Court that Tesla's facilities descriptions lacked sufficient detail in comparison with those found in UTRS's proposal.  As it stands, however, the record does not support the explanation the GSA gave for lowering its confidence for Tesla's proposal regarding HDBT facilities.  Its decision was, therefore, unreasonable.  Tesla may have been assigned a higher confidence rating had it been properly credited for ███'s proposed facilities, and this higher confidence rating could have impacted the agency's tradeoff determination; therefore, GSA's unreasonable lowered confidence rating prejudiced Tesla.

### c.   Task 10 and the 600 meter line-of-sight range

Finally, Tesla argues that GSA's lowers expectations of success rating regarding Tesla's ability to perform Task 10, due to an apparent lack of a 600 meter range, was irrational because Tesla's proposal stated specifically that two of its subcontractors could provide such a range. Pl.'s MJAR at 25–26.  Tesla once again cites its subcontractor chart to support its argument.  *Id.* at 25 (citing AR 941).  It also cites ███'s subcontractor description, which states that it has "multiple shooting ranges for up to 30mm, and which exceed the 600-meter range requirement" for Task 10.  AR 940.  Tesla contends that "[t]he Agency simply failed to read this portion of [Tesla]'s quote, which explicitly satisfies (and exceeds) the requirement to have one range with a clear line of sight up to 600 meters."  Pl.'s MJAR at 25–26.

The government argues that Tesla misreads the agency's evaluation.  Rather than stating explicitly that GSA believed Tesla lacked a range with the necessary 600 meter line-of-sight, the agency's evaluation stated:

> FACILITIES . . . Task 10 requires testing of pyrotechnic small arms tracers, battlefield effects simulators and signaling devices at a line of site range of 600m but [Tesla's] technical description does not include any information on test and evaluation capabilities at ███ [,] lowering expectation of success.

AR 1181 (internal citations omitted).  In other words, the government states that "GSA's concern was the team members' testing and evaluation capabilities for this task."  Gov't MJAR at 29. Thus, according to the government, even if Tesla's other subcontractors had 600 meter ranges, GSA could still rationally have lowered its expectations because there is nothing in the Task 10 description in Tesla's proposal that addresses ███'s capabilities with regard to a 600 meter range and ███ was the subcontractor Tesla proposed to be primarily responsible for Task 10.

The Court finds Tesla's interpretation more persuasive.  The government's interpretation might be plausible had the agency not included the header "FACILITIES."  AR 1181.  This categorization suggests that the agency's issue was not with the detail Tesla used to describe ██'s "test and evaluation capabilities" generally, but rather its description as it related to facilities.  *Id.*  The only facilities that Task 10 required were, according to the RFQ, a "clear line of sight from weapon position to target for up to 600 meters," AR 814, and a "clear line of sight from munition position to data collection equipment for up to 600 meters," AR 815.  Therefore, if the agency claims that Tesla's proposal "does not include any information on test and evaluation capabilities at ██," this indicates that the agency faulted Tesla's proposal for a lack of 600 meter line of sight range.  AR 1181.  In short, the agency lowered its expectation of success for Task 10 because one of Tesla's proposed subcontractors lacked the 600 meter range the solicitation required.

While Tesla is correct that its proposal states that two of its subcontractors have the line of sight range required for Task 10, it does not do so with clarity.  Although ██'s subcontractor description says that it has "multiple shooting ranges for up to 30mm . . . which exceed the 600-meter range requirement," AR 940, the part of the proposal discussing Task 10 in detail does not contain that information.  It does not, in fact, mention ██ at all.  *See* AR 958–59.  A reader would only see the connection between that information if they cross-referenced ██'s subcontractor description with Tesla's chart describing <mark>RPG</mark> as having "considerable capability" for Task 10 and with the proposal's description of Task 10 itself.  AR 941.  That description does not specify how Tesla proposed to use ██ to complete Task 10 or how it would work with <mark>GSI</mark> to accomplish the task.  *See* AR 958–59.  Similarly, the only place in the proposal that states ████████████ has the required 600 meter range is in the subcontractor distribution chart, which does not even assign ██ to Task 10.  AR 941.

██'s subcontractor description, meanwhile, gives no indication that it had a range with a 600 meter line-of-sight, nor does its Task 10 description contain any detailed information about the specific facilities ██ would use.  *Compare* AR 939 *with* AR 941.  While the subcontractor chart stated that ██ had "full capability" to complete Task 10, the facilities chart just below it states that ██ does not have a 600 meter range facility.  AR 941.  Even if, as Tesla argues, its proposal had all the information necessary for the agency to properly evaluate it as raises expectations of success, Tesla still had the obligation to write the proposal well enough that the information was easily accessible and understandable.  *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 213 (2019) ("It is axiomatic that the burden is on the offeror 'to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'" (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)).  Tesla's proposal is weak in this regard.

The agency made a prejudicial error, however, when it seemingly looked exclusively at the more specific description of Task 10 in Tesla's proposal without consulting the charts and the subcontractor descriptions.  Recall that the Agency faulted subcontractor ██ for only being able to "build both above and underground berms / bunkers/ structures" because Task 12 required an existing HDBT facility.  AR 1181.  As explained above, it did so despite Tesla's proposal's detailed Task 12 description containing no mention of ██.  *See* AR 960–61.  The

only part of the proposal that suggested ▮▮ had anything to do with Task 12 was the subcontractor proposal, which listed ▮▮ as having "considerable capacity" to complete it. AR 941. Thus, the Agency evidently looked beyond the detailed task description for Task 12 in evaluating Tesla's capacity to complete the contract.

However, GSA seems to have engaged in a narrower inquiry for Task 10. Had it conducted the same review for Task 10 as it apparently did for Task 12, GSA would not have lowered its expectations for Task 10 because parts of Tesla's proposal clearly stated that ▮▮ had a range facility with a 600 meter line-of-sight. AR 940–941. The evaluation does not make clear why ▮▮'s range was insufficient to allow Tesla to complete Task 10 with sufficient confidence. Just as this Court finds flaw in GSA's failure to explain how ▮▮'s lack of existing HDBT facilities lowered its expectation that Tesla could complete Task 12, the Court finds flaw in GSA's lack of explanation as to why ▮▮'s 600 meter range was not sufficient to complete Task 10. The agency looked to all subcontractors associated with Task 12 in completing its evaluation of that task, yet it seems to have only looked at primary subcontractor ▮▮ in evaluating Task 10. If GSA was going to look beyond the specific task description to find information that lowered its confidence for Task 12, it also needed to look at Tesla's whole proposal, unclear though it may have been, when it evaluated Task 10. Or, alternatively, it could have at least offered some explanation of why one subcontractor's lack of facilities to complete a task lowered the agency's expectations when there were other subcontractors that had the required facilities. Although this is a close call, GSA's unclear and incomplete explanation renders its rating of Tesla on Task 10 irrational. Had Tesla been properly evaluated, it may have merited a higher confidence rating, which may have affected the agency's tradeoff determination.

### 3. Leaving Aside the Court's Above Holdings, GSA did not Arbitrarily Assign Tesla an Overall "Low Confidence" Rating

Tesla concludes that, independent of its specific issues with three of the lowers expectations of success ratings GSA assigned it, GSA unreasonably gave it an overall Low Confidence rating. It argues that GSA could not rationally have rated it low confidence because it "received lowers expectations of success findings in only one evaluation category—facilities—and only for less than a handful of its facilities impacting just a few tasks." Pl.'s MJAR at 26. As the "evaluation record reflects it had confidence in the vast majority of [Tesla]'s offering," and the agency gave "no explanation whatsoever as to how [Tesla] received an overall Low Confidence rating," Tesla contends that the rating was unreasonable. *Id.*

Tesla's arguments are flawed on several counts. First, the administrative record shows that GSA articulated a reason for Tesla's low confidence rating beyond those found in its evaluation. The contracting officer compared UTRS and Tesla, stating that the "specificity in UTRS's quote along with other areas quoted increased the expectations of success and delivery of quality services to the Government." AR 1206. The contracting officer explained that Tesla, meanwhile, "appear[ed] to lack the necessary access to facilities capable of performing all of the explosives operating and testing requirements as outlined in the RFQ. . . . [which] creates a significant risk to successful completion of the requirements of the RFQ." *Id.* While hardly robust, this explanation is adequate. A procuring agency need only "examine the relevant data

and articulate a satisfactory explanation for its action" for the Court to uphold it.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Lacking the facilities necessary to complete several tasks specified in the RFQ is a sufficient basis upon which to award Tesla an overall low confidence rating.

Second, Tesla's argument relies on linguistic gerrymandering.  Tesla characterizes its flaws as being in "only one evaluation category," and "only for less than a handful of its facilities impacting just a few tasks."  Pl.'s MJAR at 26.  To the contrary, GSA assigned Tesla's lowers expectations of success ratings for Tasks 3, 6, 7, 8, 10, 12, and 16, half of the tasks the RFQ required.  *Compare* AR 1181 (evaluating Tesla with lowered confidence for the tasks) *with* AR 808–23 (describing the fourteen tasks).  Being judged unable to complete half of the work required for a contract is not a minor problem affecting "just a few tasks."  Pl.'s MJAR at 26.  Furthermore, though it is true that all of Tesla's proposal's flaws that the agency identified had to do with just one of the six evaluation categories, that category is foundational to the overall procurement.  As explained already, GSA required the contractor for this RFQ to provide not only the engineering services necessary to test weapons, but also the "miscellaneous equipment and facilities" necessary to test them.  AR 808.  The agency could reasonably have low confidence in Tesla's ability to complete the contract as ordered if it proposed flawed facilities for half of the tasks the solicitation described.[11]

Although GSA evaluated Tesla rationally as low confidence based on the findings it made, this Court has ruled that it reached two of those findings irrationally, at least based on the administrative record.  Having so found, the Court does not know what overall confidence rating GSA would have assigned Tesla's proposal without these two ratings.  Accordingly, although the Court finds Tesla's arguments on this point unavailing as a standalone argument, GSA must nonetheless reevaluate its opinion on whether it has low confidence in Tesla's proposal because of the Court's holdings with regard to the lowered confidence ratings on Tasks 10 and 12.  In other words, as a standalone argument Tesla's arguments on this point are flawed, but as a practical matter, because of the Court's irrationality rulings on Tasks 10 and 12, GSA may need to reevaluate its overall low confidence rating after it has reexamined its evaluation of Tesla's proposal with regard to Tasks 10 and 12.

### 4.   GSA Used a Seventh Factor not Previously Stated to Evaluate Offerors' Subcontracting Plans Unequally

For its next argument, Tesla turns to GSA's evaluation of UTRS's proposal.  The contracting officer stated that the agency "based [its] review [of the proposals] on . . . six overarching areas of focus to provide underlying bases and rationale to support their overall

---

[11] Returning to the basketball metaphor the Court used earlier, the agency would rationally evaluate a proposal to stage a basketball game as Low Confidence if that proposal either lacked a basketball court as required by the solicitation or proposed to use one that was not regulation size.  Even if this was the only flaw in the proposal, the ability to hold a basketball game requires a court.  The procuring agency could determine rationally that this single flaw undermined its confidence in its proposal to the extent that it had overall Low Confidence in the proposing party's ability to complete the task.  The same is true in this case, as a proposal that lacked the required weapons testing facilities will inevitably fail to complete the tasks properly.

assigned confidence rating for each": proposed approach and solutions to tasks, relevant corporate experience, risk management and quality control, security requirements, staffing plans for providing subject matter expertise, and facilities.  AR 1195–96.  The evaluations largely reflect these factors, as the agency gave each proposal lowers or raises expectations of success designations based upon them.  *See* AR 1180–82.  For UTRS's proposal, however, GSA had a seventh designation.  Using the same header text it gave to the other six stated factors, GSA highlighted UTRS's proposed subcontracting plan, which it lauded for "provid[ing] a plan to complete the task requirements with only minimal subcontractor support, lowering the risk of ineffective technology integration of complex tasks, logistics burdens, and information security." AR 1180.  Tesla believes the agency's failure to evaluate it under the same criterion constitutes disparate treatment.

To prevail on disparate treatment claim, a protester must show either that "the agency unreasonably downgraded its proposal for deficiencies that were substantively indistinguishable or nearly identical from those contained in other proposals" or "that the agency inconsistently applied objective solicitation requirements between it and other offerors."  *Off. Design Grp.*, 951 F.3d at 1372 (internal quotations omitted).  The Court must keep the scope of its review in mind as it weighs disparate treatment claims; "[i]f plaintiff fails to demonstrate that the proposals at issue are 'indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of 'minutiae,' which is an inappropriate exercise for the court to undertake."  *Blue Water Thinking, LLC v. United States*, 159 Fed. Cl. 65, 77 (2022) (quoting *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)).

Tesla makes two arguments under the banner of disparate treatment.  First, it contends that,

> while the Agency improperly downgraded [Tesla's] evaluation rating based on its erroneous belief that [Tesla] does not have an existing HDBT facility because ███ purportedly "require[s] the user to provide plans and inspections to ensure suitability," UTRS's quote includes the same representation. . . . UTRS possessed only "a nearly complete set of diagrams, prints, and drawings" for its HDBT facility, and still had more work to do; yet only TLI was penalized for its purportedly incomplete HDBT.

Pl.'s MJAR at 27–28 (quoting AR 1199 and 1027).  This argument rests entirely upon a particularly egregious example of selective quotation.  Recall that the agency faulted Tesla's subcontractor ███ under Task 12 because, while it "can provide the equipment to build both above and underground berms / bunkers/ structures[,] . . . Task 12 . . . requires an existing HDBT facility."  AR 1181.  ███ had no existing HDBT facility, and the agency faulted Tesla for it. Tesla views this as a clear example of disparate treatment because, it claims, UTRS possessed only "'a nearly complete set of diagrams, prints, and drawings' for its HDBT facility, and still had more work to do."  Pl.'s MJAR at 28 (quoting AR 1027).

This sentence, taken from UTRS's proposal, says nothing of the sort.  The sentences that precede the one Tesla quotes state that

such a facility does exist – outlined in section 12.1 – which is what we are proposing for supporting this effort. ████████████████████████████
████████████████████

AR 1027.  The sentence Tesla quotes, meanwhile, reads, in full:

> *Beyond physical access*, a nearly complete set of diagrams, prints, and drawings has been obtained and converted to electronic recall; power and support infrastructure has either been repaired, upgraded, and modified and/or installed; and a wide array of instrumentation supporting both cyber and physical operations has been implemented and available for use.

*Id.* (emphasis added).  These sentences support the complete opposite proposition for which Tesla cites them.  UTRS had an existing HDBT facility, and it offered both schematics for it and physical access to it for GSA's inspection.  Tesla's selective quotation leads it to make a specious argument that lacks any apparent evidentiary support.  *See* RCFC 11(b).  Indeed, it would be like a food critic writing that a restaurant was "certainly not the best in the city," and the restaurant gravely misleading the public by posting the critic's review on its door as ". . . the best in the city."  Tesla's argument is equally deceptive and cannot suffice to show disparate treatment.

Tesla's second argument is more structural.  It argues that GSA's decision to praise UTRS for its subcontractor plan subjected Tesla and ████████ to disparate treatment.  Pl.'s MJAR at 27; ECF No. 27 at 15.  According to Tesla,

> [t]he Agency did not evaluate [Tesla]'s quote using the same objective criteria and, had it done so, would have either not assigned the positive finding to UTRS or would have assigned a similar positive to [Tesla], which included a more comprehensive subcontracting plan discussion than UTRS's quote.

Pl.'s MJAR at 27.  In short, only UTRS seems to have been evaluated for its subcontracting plan.  To laud UTRS alone for this feature, Tesla contends, was disparate treatment.

This argument has merit.  The contracting officer stated specifically that the agency evaluated all three proposals using only six factors.  AR 1194–1195.  The evaluations mostly reflect this assertion, as each one had the six factors listed in either the "raises expectations of success" or "lowers expectations of success" sections of the evaluation in capital letters.  *See, e.g.*, AR 1180 (placing "PROPOSED APPROACH AND SOLUTIONS TO TASKS" in "raises expectations of success" for UTRS); AR 1181 (placing "FACILITIES" in "lowers expectations of success" for Tesla); AR 1182 (placing "SECURITY REQUIREMENTS" in "raises expectations of success" for ████).  Only UTRS had "SUBCONTRACTING PLAN" as one of its evaluation factors.  *Compare* AR 1180 *with* AR 1181–82.  And, contrary to the government's assertion at oral argument, the blanket statement GSA placed at the end of each evaluation that "[a]ll other areas of the contractor's proposal in accordance with Section 37.1 of the solicitation were considered adequate" does not ameliorate the issue.  AR 1180–82.  The

evaluations placed every evaluation factor in capitalized letters under either "raises expectations of success" or "lowers expectations of success," but did not do so for the subcontracting plan category for Tesla or ███████. AR 1181–82. Both ███████ and Tesla were effectively downgraded in comparison with UTRS because GSA did not apply the same categories to all three.

Based on the Court's review of the evaluations from the first, cancelled procurement that were included in the administrative record, it appears that GSA simply forgot to include the subcontracting plan evaluation factor for either Tesla or ███████. Recall that the RFQ at issue here was the second for which all three of these offerors submitted bids. Pl.'s MJAR at 8; Gov't MJAR at 13. Prior to the first RFQ's cancellation, GSA performed evaluations on the proposals submitted just as it did with the RFQ at issue here. AR 689–96. It used the same six evaluations factors as it did for the second evaluation, but also evaluated each bidder on its subcontracting plan. *Id.* Most relevant here, Tesla received a "raises expectations of success" rating for its subcontracting plan because it "provided a plan to complete the task requirements with only minimal subcontractor support, lowering the risk of ineffective technology integration of complex tasks, logistics burdens, and information security." AR 691. This language is identical to the language found in UTRS's second evaluation. *Compare* AR 691 *with* AR 1180. The text of Tesla's subcontracting plan in its first proposal is, moreover, nearly identical to the subcontracting plan in its second proposal. *Compare* AR 509–10 *with* AR 944. Had GSA evaluated Tesla's second proposal under this factor, it would likely have garnered another "raises expectations" rating given that the subcontracting plans were virtually identical from proposal to proposal. At the very least, the agency was required to discuss the subcontracting plan in its evaluation of Tesla if it did so for UTRS. While the Court does not know what expectation score Tesla would have received had GSA done so, Tesla has sufficiently demonstrated that GSA engaged in disparate treatment in its evaluation that this disparate treatment may have downgraded Tesla's confidence score. Because Tesla's overall confidence rating may have been higher if it had received a positive rating on its subcontracting plan, Tesla was prejudiced by this error.

### 5.   Tesla has not Demonstrated that GSA's Labor Mix Analysis was Flawed

Tesla argues next that GSA failed to analyze each bidder's proposed labor mixes as required by the FAR. The RFQ at issue solicited quotes for services requiring a statement of work and prices at hourly rates. AR 841. The FAR requires an agency to "consider[] the level of effort and the mix of labor proposed to perform a specific task being ordered, and . . . determine[e] that the total price is reasonable," FAR 8.405-2(d), as well as for it to document its analysis, FAR 8.405-2(f)(6). Essentially, the RFQ listed job positions relevant to the work required and GSA had to analyze each proposal to determine whether the workers proposed to fill those job positions were reasonable. Tesla takes issue with GSA's single-sentence documentation of this analysis: "The Level of Effort and all labor categories were evaluated and were determined to be in accordance with the government's requirements." Pl.'s MJAR at 29 (quoting AR 1194). Tesla contends that the sentence does not explain "who performed the evaluation, how it was performed, or how UTRS met the requirement," nor whether UTRS's "quoted [labor categories ("LCATs")] are appropriate to perform the work at a reasonable price,

including that they entail the full scope of work required for the functional positions in the RFQ." *Id.*

In support of this argument, Tesla scrutinizes whether two of UTRS's proposed LCATs properly fulfilled the requirements expressed in the RFQ. First, it argues that the price UTRS quoted for the senior program manager level was unreasonable. *Id.* at 29–30. The RFQ required a "Program Manager Sr," *see, e.g.*, AR 810, that GSA's IGCE estimated would have an hourly rate of $170, AR 1211. UTRS offered its "███████████████████" for this position at an hourly rate of $████. AR 1166. Tesla questions this choice because UTRS previously submitted a "████████████████" for this position at an hourly rate of $████ when it responded to the previous RFQ.[12] Pl.'s MJAR at 30 (citing AR 658). Tesla also questions why a principal program manager, which "exceeds the experience requirement [for the senior program manager position] by 5 years, was appropriate given that the agency did not change the job position's duties between solicitations. *Id.* UTRS not only submitted a program manager with an hourly rate $████ above the IGCE for the position, but it did so despite having previously proposed a program manager that fit the position precisely. *Compare* AR 1166 *with* AR 658. Tesla argues that the agency's failure to explain why this was reasonable was irrational.

Although Tesla's argument has some merit, it is insufficient to establish prejudicial error as a standalone argument. What Tesla's argument on this point really amounts to is an attack on the agency's price reasonableness analysis. Tesla argues that the $████ per hour rate for the ████████████████ is unreasonable when the task can be accomplished by a ████████. This may be true, but GSA was only required to evaluate proposals for overall price reasonableness. Identifying one single labor category out of six and arguing that its hourly rate makes the overall price unreasonable, without more, is insufficient to show agency error under the facts of this protest. As GSA will need to reevaluate price reasonableness, however, as is explained later in this opinion, it may want to reexamine labor category pricing or at least provide further explanation of the analysis that it conducted, as a protestor pointing to several categories with similar potential pricing issues could more effectively challenge an overall price reasonableness analysis.

Second, Tesla cites a similar flaw with UTRS's proposed candidate for the RFQ's Senior Engineer function. UTRS proposed to use a "████████████████████" for that position. AR 1166. In its proposal, UTRS stated that this scientist

> [d]irects the activities of other technical professionals in performing analytical and scientific investigative studies. Provides critical reviews of scientific and engineering literature and makes decisions on the adequacy and merit of ongoing investigations. Designs or selects methodology to be used in the analysis of unique or complex data collected from technical investigations and gathered from literature; and performs or directs analyses as required. Provides leadership for the development of complex programs or processes. Provides guidance on technical issues for mission-critical activities. Certifies compliance with applicable protocols.

---

[12] While UTRS's initial proposal's senior program manager had an hourly rate of $████, it ████████████████. AR 658. UTRS offered ████████████████. AR 1166.

AR 1086.  Notably absent from this description, Tesla argues, is any skill in engineering.  Pl.'s
MJAR at 31.  As Tesla points out, some tasks to which the RFQ assigned the Senior Engineer
required, as the position name suggested, engineering services.  *Id.*  Task 11, for example,
required "engineering services and test support for the demonstration of weaponized UAS
systems for both the effectiveness and the development of defenses."  AR 815.  Consequently,
according to Tesla, "[t]he Agency should have found this LCAT inappropriate," and because
"[i]t is unclear from the record how UTRS's ███████████████ could provide these
services or why the Agency found the LCAT appropriate," Tesla contends that the agency
violated the FAR.  Pl.'s MJAR at 31.

   Tesla has not met its burden of proof on this argument.  First, it is not clear that GSA's
alleged error prejudices Tesla sufficiently even if proved.  Explaining the prejudice it suffered by
the agency's action, Tesla says only that the agency accepting UTRS's scientist as the senior
engineer prejudiced it "because, under a proper evaluation, the Agency would have found
UTRS's LCATs inappropriate for all the required tasks and rejected, thus, UTRS's quote, giving
[Tesla] a substantial chance of receiving the award."  *Id.*  This argument suggests that all of
UTRS's proposed LCATs are inappropriate for the tasks for which it proposed them, yet Tesla
describes the alleged flaws of only two of them.  *Id.* at 28–31 (finding flaw with UTRS's
proposed "███████████████" and "███████████████").  Such
arguments cannot succeed based on a "[f]or instance."  *Id.* at 29.  As its arguments relate to only
two LCATs, Tesla does not show that "'there was a substantial chance it would have received
the contract award but for the' challenged action" even if its arguments on this point were
correct.  *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 237 (2021) (quoting *Glenn Defense
Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013)).  Tesla does not
elaborate, for example, on how its own proposed LCATs were evidently superior for these two
positions, or why reversing the agency's decision to find these particular LCATs appropriate
would undermine the reasonableness of the agency's decision to award the entire contract to
UTRS.  Tesla had to provide such proof to properly show prejudice and succeed in its challenge.

   Second, the Court does not find the GSA's judgment that UTRS's proposed scientist
could perform the Senior Engineer function irrational.  Despite Tesla's claims that "[i]t is unclear
from the record how UTRS's ███████████████ could provide [engineering] services,"
Pl.'s MJAR at 31, the second sentence of the capability description it quotes to describe this
scientist's functions specifically states that the scientist can ███████████████
█████████████," *id.* at 30 (quoting AR 1086) (emphasis added).  The ability to review engineering
literature critically certainly implies some expertise in engineering.  Tesla's citation to the
engineering work described in the task descriptions for Tasks 11 and 14 is also not particularly
persuasive because neither task requires the Senior Engineer alone to perform those engineering
tasks.  *See* AR 815–16 (assigning not only a Senior Engineer but also a Senior Engineering Tech
and an Engineer to task 11); 819–20 (assigning the same to Task 14, but also adding a Computer
Science Engineer).  As the Senior Engineer, UTRS's scientist would have performed a
supervisory function not necessarily dissimilar to the work of ███████████████
█████████████" in which UTRS claims its scientist specializes.  AR 1086.
As Tesla does not explain why these other engineers assigned to the tasks it cites would not

ameliorate any perceived shortfall in UTRS's scientist's ability to supervise the required engineering work, considering the scientist evidently has some skill in engineering, the Court cannot find GSA's decision irrational.

Furthermore, Tesla's argument is inconsistent with the flexibility the solicitation gave GSA to determine whether the LCATs the offerors proposed were acceptable for the positions listed in the RFQ. The RFQ stated that "[f]or each of the labor hour tasks, the offerors shall cross reference their proposed Federal Supply Schedule labor category to each of the functional position titles stated in the RFQ." AR 841. In the example chart it gave, GSA matched a functional position of "Program Manager" to the Federal Supply Schedules' LCAT for "Project Manager." *Id.* Although the positions may be identical in their function, the fact that GSA said that it would accept a proposed LCAT with a title different than the Federal Supply Schedules' LCAT suggests that the ability to complete the work associated with the task was the salient factor. In other words, even a job title such as "████████████████████" was acceptable if that person could perform the work of a Senior Engineer. Tesla's argument based largely on the "████████████████" title alone is, therefore, unavailing and required more explanation as to why the proposed scientist could not act as Senior Engineer.

### 6.  The Government Waived any Response to Tesla's Price Reasonableness Arguments When it Failed to Respond to Them in its Cross-Motion

Beyond taking issue with the technical evaluation of its proposal, Tesla also asserted in its motion for judgment on the administrative record that GSA irrationally conducted the required price reasonableness determination. The RFQ required that "[o]fferor's pricing . . . be evaluated to ensure proposed rates do not exceed the offeror's Federal Supply Service Schedule rates. Price analysis will be performed so that a fair and reasonable price determination can be made by the government." AR 842; *see also* Office of the Under Secretary of Defense, *Class Deviation—Determination of Fair and Reasonable Prices When Using Federal Supply Schedule Contracts* (March 13, 2014), https://www.acq.osd.mil/dpap/policy/policyvault/USA001004-14-DPAP.pdf (requiring FAR 15.404-1 to be applied to this procurement because the Defense Department is the ultimate client). In analyzing proposals for price reasonableness, GSA applied three FAR-sanctioned methods: (1) comparison of proposed prices received in response to the RFQ (*see* AR 1207–09); (2) comparison with competitive published labor rates (*see* AR 1211–12); and (3) comparison of proposed prices with the IGCE (*see* AR 1211). *See* AR 1193–94 (explaining that the agency used price analysis techniques from FAR 15.404-1 as required by DFARS 208.404 and DoD Class Deviation 2014-O0011). According to Tesla, there were errors with all three price analysis methods applied by GSA, rendering GSA's price reasonableness determination irrational. Pl.'s MJAR at 31–36.

Despite the roughly five pages that Tesla spent arguing that "The Agency's Price Analysis Was Irrational, Arbitrary, and Capricious," bewilderingly the government missed this entire argument in its response brief. Its cross-motion stated merely that GSA *performed* a price reasonableness analysis but did not engage whatsoever with Tesla's arguments about the *manner in which GSA performed* the analysis. Gov't MJAR at 32–24. Although it partially did so in its reply, the government waived those arguments by not addressing them in its cross-motion for judgment on the administrative record. Indeed, counsel for the government could not identify

anything in its cross-motion addressing Tesla's three price reasonableness arguments when pressed by the Court at oral argument. By failing to respond, the Court must assume that the government accepts the truth of Tesla's allegations. For that reason alone, Tesla succeeds in its challenge to GSA's price reasonableness analysis.

As mentioned above, GSA applied three price analysis techniques to determine price reasonableness and Tesla took issues with the application of all three. First, Tesla argues that "the Agency's comparison of the vendors' labor rates and total prices was irrational because the rates and overall prices vary widely, yet the Agency simply noted that 'all three contractors offered discounts from their GSA schedule price lists in most of their labor categories ranging from 0–20%' and concluded '[t]he comparison of these averages indicates UTRS' quotation is in line with all the offers.'" Pl.'s MJAR at 32 (quoting AR 1209–10). According to Tesla, GSA specifically failed to adequately analyze UTRS's labor rates, which Tesla contended had been underestimated. *Id.* at 33. Second, Tesla asserts that the agency miscalculated the IGCE, thereby inflating the IGCE's total estimated cost. Tesla argues that the IGCE inflated the estimated reasonable cost by $25 million because it included "extra indirect costs that were already baked into the labor rates" upon which the IGCE was based. *Id.* at 35. Thus, Tesla contends, UTRS's price would have looked much less reasonable had the inflated $25 million been subtracted from the IGCE. Finally, Tesla takes issue with the other schedule contract holders to which GSA compared the offerors' proposed prices. It asserts that "in an apparent attempt to justify UTRS's exorbitant [program manager] rate, the Agency sought out other schedule contract holders that did not submit a quote for this procurement and are not comparable businesses to make UTRS's rate appear reasonable." *Id.* at 34.

The Court need not evaluate the merit of these arguments because the government has assented to their truthfulness. A well-known litigation principle holds that "failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 59 (2021); *CardSoft v. Verifone, Inc.*, 769 F.3d 1114, 1119 (Fed. Cir. 2014) ("Arguments that are not appropriately developed in a party's briefing may be deemed waived."). The government failed to respond to Tesla's arguments about the alleged flaws with GSA's application of its chosen price analysis techniques. Instead, in response, the government only stated the truism that "GSA found UTRS's quote was fair and reasonable after conducting a price analysis that involved comparing: (1) pricing among the three offerors (Tesla, UTRS, and ████████), 2) the offerors' price quotes to the IGCE, and 3) UTRS's pricing to competitive published price lists of three other vendors. The FAR requires nothing more." Gov't MJAR at 34. But this sentence does not respond to Tesla's arguments that the way the agency performed those price reasonableness evaluations was flawed. Similarly, though Tesla supported its arguments with citation to both *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 336 (2020), and *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003), the government cited neither in its cross-motion, nor distinguished them from the instant case. By failing to do so, the government waived any response to Tesla's arguments, and this Court must assume these otherwise reasonable arguments are correct. That is to say, that the Court must assume that GSA's price reasonableness determination was irrational.

Belatedly, in its reply, the government responded in part to Tesla's price reasonableness analysis arguments. There, it recognized that "Tesla cites cases like *Nutech Laundry & Textile, Inc. v. United States* to suggest that the Government's comparison of UTRS's pricing to the IGCE . . . was inappropriate because the Government's IGCE was flawed." ECF No. 28 at 14. *Nutech*, it argued, was inapposite because it required only that "the agency . . . be able to demonstrate the basis for the estimate, where . . . analysis is questioned." *Nutech*, 56 Fed. Cl. at 594. According to the government, as the IGCE in this case was "a robust fifteen-page document that includes detailed estimates of costs broken out by task—including materials, six labor categories, several categories of direct costs," the IGCE provided a reasonable basis for comparison. ECF No. 28 at 14. But this argument comes too late, as such contentions had to have been presented in the government's first responsive brief. *Pandrol USA, LP v. Airboss Ry. Prod.*, Inc., 320 F.3d 1354, 1367 (Fed. Cir. 2003) (refusing to consider an argument because it "was waived when it was not raised in response to the motion for summary judgment."). What is more, even had it included this argument in its cross-motion, it still did not respond to the other two price reasonableness arguments Tesla made. The government simply did not address several important and detailed arguments Tesla made in its motion for judgment on the administrative record.

The government insisted at oral argument, however, that it had. The Court gave counsel for the government the opportunity to point to the page of its cross-motion on which it responded to Tesla's arguments. ECF No. 30 at 207:20–21 ("Tr."). Government counsel pointed only to its general argument that "Tesla d[id] not cite a single case that requires agencies to conduct the type of granular pricing, level of effort, or labor mix analysis that Tesla claims GSA was required to perform in this case." *Id.* at 208:17–20. It also stated that its cross-motion cited to portions of the administrative record that showed the Agency had performed a price reasonableness analysis. *Id.* at 222:16–19. Again, however, Tesla challenged the rationality of aspects of the price reasonableness analysis, not whether GSA performed such an analysis. These arguments the government feebly gestured at during oral argument simply do not respond to Tesla's price reasonableness arguments.

Finally, the Court must note that, even had the government responded adequately to Tesla's arguments regarding price reasonableness, the agency's analysis would nonetheless be difficult to defend on the administrative record presented to the Court. The explanation of the price evaluation in the record is sparse, stating only that

> [t]he Contracting Officer compared: 1) competitive pricing among the three offerors; 2) offerors' price quotes to the Independent Government cost estimates (IGCE); and 3) competitive published price lists of three other vendors to make a fair and reasonable price determination. Please see the section titled "Analysis and Observations for Factor 2 – Price Analysis in compliance with FAR 15.404-1 based on the DoD Class Deviation 201-O0011" under DFARS 208.404 for detailed price analysis.

AR 1194. But the Court could not locate this document within the record, nor did the government cite its location in the record. As it apparently contained the primary explanation GSA used to justify its price reasonableness analysis, the document's omission from the record is

baffling.  If this document is in the record and the Court was unable to locate it, the government should have made its presence clearer.  *See Facility Healthcare Servs., Inc. v. United States*, 158 Fed. Cl. 254, 258 (2022) ("[I]t is not the Court's responsibility to scour the over 5,000-page-long administrative record in search of evidence that may or may not exist to advance Plaintiff's case." (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")).  Although there is some level of summary detail of such an analysis included in the best value determination, *see* AR 1207–12, it is unclear whether this is the actual price analysis or if it is derived from a more detailed analysis not included in the administrative record.  Given the apparent missing "Observations for Factor 2" document and the lack of any explanation from the government regarding this document, the Court would have had a hard time finding the agency's price reasonableness analysis rational based upon this record that lacks the key documentation even had the government bothered responding to Tesla's arguments.

### 7.  GSA Must Redo its Best Value Judgment for This Procurement

Finally, Tesla argues that the contracting officer made a flawed best value determination.  Pl.'s MJAR at 36–39.  First, Tesla makes an argument that is derivative of those that Tesla made earlier in its motion; the contracting officer only made a flawed evaluation if, as Tesla asserts, "the Agency's underlying evaluations of quotes are arbitrary, capricious, [or] contrary to law." *Id.* at 37.  Second, Tesla also faults the contracting officer for "fail[ing] to conduct a qualitative comparison of the underlying merits and price of [Tesla]'s quote to that of UTRS's quote and fail[ing] to perform a tradeoff analysis, as required." *Id.*  Tesla suggests that these omissions indicate that the contracting officer "did not understand the highly technical nature of this procurement[,] blindly accepted the technical evaluations and baldly concluded UTRS's higher technical rating merited its almost $▇▇▇▇▇ higher price." *Id.*  According to Tesla, the contracting officer's "alleged 'analysis' and 'comparison' consist only of a recitation and adoption of the underlying technical and price evaluation findings," the contracting officer found only "'that exchanging $▇▇▇▇▇▇▇ for a High Confidence technical quote is in the best interest of the Government' without any explanation as to why -- other than because 'the Technical requirement is more important than price.'" *Id.* at 38 (quoting AR 1206, 1213).

The Court does not need to address either of these arguments directly because of this opinion's holdings.  An agency can only make a rational best value determination if the findings that underlie the best value determination are themselves rational.  Moreover, an agency cannot make a rational best value determination that trades off price for superior performance if an agency does not know if the price it is trading off is reasonable.  The Court has found that GSA's lowers expectations of success ratings for two of the seven tasks for which it sanctioned Tesla were irrational, that GSA engaged in disparate treatment in its evaluation of subcontracting plans, and the Court must assume that Tesla's issues with how the government performed its price reasonableness evaluation are correct because the government waived its response to them.  Accordingly, the Court does not know what the result of GSA's best value determination would be if Telsa's proposal had been properly evaluated or whether the proposed prices to be traded off are reasonable.  For these reasons, GSA must redo its best value determination after it has rationally evaluated the proposals and rationally determined that the proposed prices are reasonable.

The Court will address briefly, however, an argument the government made throughout its cross-motion.  Defending its best value determination and other areas of this procurement deficient in explanation, the government emphasized several times that, "[w]hen examining a FAR Part 8.4 procurement, the Court may only consider whether the tradeoff decision was 'reasonable and within the agency's discretion,'" Gov't MJAR at 35 (quoting *Distrib. Sols. Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012)), because of the "'truncated procurement process' established by Far Part 8.4 to 'provide a more simplified and flexible approach' to procurements," *id.* (quoting *Sys. Plus, Inc. v. United States*, 68 Fed. Cl. 206, 211 (2005)).  The undersigned has registered his disagreement with this argument in detail in another protest. *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 607–10 (2023).  To restate briefly here, a procuring agency must document and explain its basis for awarding a contract to a particular offeror with sufficient clarity even in FAR 8.4 procurements.  *See id.* at 607 (holding that "even if the FAR permitted the level of streamlined documentation the government argues for, effective judicial review under the Tucker Act, applying the APA standard, requires more documentation of the reasoned basis for the agency's decision."); *accord* FAR 8.405-1(g) (prescribing minimum documentation requirements for a procuring agency using FAR 8.4).  Some of GSA's evaluations in this case were too truncated to demonstrate rationality under the relevant APA standard and thus cannot pass muster no matter what amount of streamlined documentation FAR 8.4 permits.

## 8.  Tesla is Entitled to Injunctive Relief

Having demonstrated several prejudicial errors in how GSA conducted this procurement, Tesla seeks permanent injunctive relief to prevent GSA from awarding UTRS the task order at issue in this protest.  Reciting the familiar standard for acquiring such equitable relief, Tesla asserts that it "will suffer irreparable harm, including loss of this Order and the resulting profits and past performance, if the Court does not enjoin the Agency."  Pl.'s MJAR at 39 (citing ECF No. 1-5 ¶¶ 15–17).  It also asserts that "the Government will suffer minimal or no harm if an injunction is entered and will indeed save almost $███████ and receive a superior offering. Additionally, any harm to the Agency was caused by its own actions, which are contrary to law." *Id.*  Moreover, according to Tesla, the public interest is better served by "ensuring the Agency properly follows applicable statutes, including those intended to further fair and equitable competition in government contracting."  *Id.*  The government responds that "lost opportunity and profits on their own do not establish irreparable harm," and "delays in starting the work contemplated by the RFQ . . . significant[ly] degrad[es] . . . the Department of Defense's emerging technologies capabilities, which are critical to the current war in Ukraine and future operational environments against near peer threats such as China."  Gov't MJAR at 38; *see also* ECF No. 24-1 ¶¶ 4–9 (issuing an affidavit from the Deputy Director of Engineering Operations Energetics and Warheads Directorate at the United States Army DEVCOM Armaments Center asserting the same).

The Federal Circuit has stated that a permanent injunction may issue if:

(1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships

to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  For the irreparable harm prong, the key inquiry is "whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993).  As for the public interest prong, many judges on this Court have held that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003); *see also Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 586 (2010) ("There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations.") (citation and internal quotation marks omitted).

Tesla satisfies all four injunctive relief factors.  First, for reasons stated already, it has succeeded on the merits of its bid protest.  Second, contrary to the government's argument, judges of this Court have often held that "a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 619 (2020) (citing *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009)); *accord CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.").  Tesla lost the opportunity to compete for this contract when GSA committed prejudicial errors in evaluating this procurement, lost the profits that would have come with successfully achieving that contract, and cannot reasonably redress these losses with a suit for damages at law.  *See Younger v. Harris*, 401 U.S. 37, 43–44 (1971) ("[T]he basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.").

The balance of hardships also weighs in Tesla's favor.  The only harms the government cites are non-immediate and speculative; if mere "delays in starting the work contemplated by the RFQ . . . [that] significant[ly] degrad[es] . . . the Department of Defense's emerging technologies capabilities" related to "future operational environments against near peer threats such as China" were an irreparable harm, virtually no protestor challenging a Defense Department procurement could obtain an injunction.  Gov't MJAR at 38.  The history of this procurement, furthermore, weighs against giving credit to the government's argument.  The agency issued the initial RFQ for this procurement on June 2, 2023, then cancelled it on August 4, 2023.  AR 316, 698.  The agency issued the second RFQ only a month-and-a-half later on September 21, 2023, then awarded the contract in only five months, on February 20, 2024.  AR 703, 1217.  The short time frames between procurements and the resulting award suggests that GSA can act quickly when it so desires.  A delay of several months at most seems unlikely to seriously degrade the Defense Department's ability to respond to urgent national security threats at least with regard to this procurement.  Finally, the public interest obviously favors ensuring the integrity of the procurement process.  *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242 (2010) ("There is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations.").  As

explained already, several aspects of this procurement were irrational.  Tesla is, therefore, entitled to a permanent injunction.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Tesla's cross-motion for judgment on the administrative record.  Similarly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's cross-motion for judgment on the administrative record.  Additionally, the Court orders that:

1. The United States, including the General Services Administration, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining, or continuing to obtain, performance from UTRS on the task order awarded to UTRS pursuant to the RFQ at issue in this protest;

2. Furthermore, the United States, including the General Services Administration, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from awarding a task order under the RFQ at issue in this protest or allowing any contractor to perform under any task order under the RFQ at issue in this protest until the General Services Administration reevaluates the proposals it received in response to the RFQ in a manner that is consistent with the holdings in this opinion and re-performs both a price reasonableness analysis and best value determination in a manner that is not inconsistent with this opinion; and

3. The Clerk shall enter final **JUDGMENT** accordingly.

**IT IS SO ORDERED**.


<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge